We are hearing this case postponed from last week's oral argument. I'm glad everybody could get together. Sorry for the health problems somebody experienced last week, but I hope we're all here in good shape today, judges too. So, the appellant can proceed. Good morning, your honors. Solomon Serra, appearing for the appellants who are the plaintiffs below in the district court. I'd like to just initially thank and express my appreciation to the court for allowing this hearing to be continued in light of the health issues that arose, and we're ready to go today. Your honor, the report and recommendation of the magistrate judge is really what's at issue here today, and it was on plaintiff's motion for class certification pursuant to Rule 23A and 23B3. The magistrate judge, however, did not get into any of the Rule 23 factors whatsoever, and in fact, no court has yet to address any of the underlying Rule 23 factors. The magistrate judge indicated explicitly he was not going to reach the class certification question. This is the record on Appeal 1372. What this appeal really turns on is a question of standing and injury in fact, because that is what the magistrate judge and the district court in his de novo review ultimately found plaintiffs could not satisfy, could not show the existence of standing. Now, the magistrate judge in the order, which is the only substantive order really that's before the court right now with an analysis, repeatedly said that plaintiffs failed to plead injury in fact, and therefore had no standing. But the pleadings had long been settled years before that order was issued. There had been schedules for motions directed to the pleadings. All such motions had been resolved without any reference whatsoever to the standing issue, and defendants made no motion at any time challenging standing. The time to file motions directed to the pleadings had long passed by the time the date arrived for class certification proceedings to commence. We've never had any argument made in the pleading context of this case over two years that there was a lack of standing, and we believe that's for good reason, because we believe obviously that the finding of lack of standing was legal error. Now, the review by this court of a finding of lack of standing is de novo. And with respect to the class... So let me stop you there. Your point about it being raised late, are you saying it was forfeited in some way, or is the issue fully before us? Are you making some procedural argument that standing somehow, which is a jurisdictional question that has to be addressed, has been the right to bring that argument? It was lost in some way? No, Your Honor, I'm not saying that. I mean, obviously, we understand... Okay, just want to make sure, to relay the background, you can proceed. Okay, thank you. With respect to the class certification order, that is reviewed for abuse of discretion, but legal conclusions with regard to class certification issues such as lack of standing, again, are reviewed de novo. So our case, I think, has been laid out quite well. We contend that the defendants sold these embedded policies to the plaintiffs and the class members at prices that were inflated to some degree, not in their entirety. We're not saying that the billions of dollars that Santin earned in premiums during the class period we've identified all need to be returned if, in fact, we prevail. We're not saying that. We're saying that some portion of the premiums that plaintiffs paid were inflated. And they were inflated because the defendants had published materially inaccurate lists of network providers. Now, this is a breach of contract case, as we've pled it. That's the cause of action that is alive and before the court. Counsel, excuse me. Do you think there's a difference between what the magistrate says you must establish for the breach of contract as opposed to what you're arguing? No, I don't think there's a dispute about the elements of the breach of contract claim. But, Your Honor, we have alleged that claim. It was initially upheld and not challenged further. The district court found it had been adequately alleged. The plaintiffs pled in that complaint, the first amendment complaint, the operative complaint, that were entitled to benefit of the bargain damages. That's a traditional contract remedy that confers standing on its face. And this is in paragraph 97B, for example, of the first amendment complaint. So, I don't think we have a dispute about the elements of the claim. We've satisfied all that. The issue is, of course, standing. And there's a difference of opinion, a dramatic one, with regard to whether injury, in fact, has occurred. Now, our underlying premise of this, that there is a material overstatement of available providers, is not really disputed here. It was, in fact, admitted by defendant's own 30B6 witness who testified that approximately 50% of the representative providers in the network were, in fact, unavailable to treat policyholders. That's the record on appeal at 721 and 722. Also, you cited that set of pages in your brief. I looked at the deposition. I'm not sure what the defense witness was admitting to. It seems to me he's the witness. I don't know what name the person is. acknowledging that perhaps a better estimate would be 50% of the providers listed on the provider list might not have gotten claims within a particular previous year. I don't see the concession on the part of the defendant, so help me with that. If it's there, it's there, and I want to know about it. Certainly. Well, we do think that that testimony indicates that there was a material inaccuracy in the list of providers. The reason is the traditional test, and this is explained in the expert report of Dr. Hayter, is that, and I think this is well accepted in the literature, is you look at a year's worth of claims data, and you see if any provider had submitted a claim for reimbursement to the insurance companies, here the defendants, and if they had not, they are deemed and accepted to be not available. That is the, I think, generally accepted standard in the industry, and our expert has identified that in his report. That is how that was done. Now, Your Honor, Judge Subwood, it may be the case that a trier of fact could find the testimony unclear, vague, maybe not entirely supportive of this, but there's still an admission of a deficiency and inaccuracy in the provider list, and that is, in fact, our claim that we've pled and was upheld. It seems to me, regardless of whether there's an inaccuracy or not, the master judge upheld by the district judge was holding that you hadn't shown injury, that there was a Daubert determination, it seems to me, more than anything, that the evidence you had ultimately suggests that you're, not suggests, that caused the holding that your own individual clients did not have an outstanding. Tell me your, give me your argument of why Daubert, to what extent does Daubert apply at the stage it was applied here? We don't disagree with the application of a Daubert at the class certification stage. It's certainly appropriate that the defense be permitted to make such motions, but what's really critical here is their Daubert motion challenging Dr. Hader was denied, and the denial of that Daubert motion, allowing our expert evidence to come in, be deemed to be admissible, is very significant, because it shows that those standards under Kumho-Tyre, that it's reliable evidence. Counselor, it was found to be admissible. I think you responded to it in your reply brief. The appellees cited Judge Higginbotham's opinion in Prantile, however, that word is, name is pronounced. It seems unclear to me how far the Fifth Circuit has already stated we go at the class certification stage. And if you allow my pronunciation of it, which is perhaps incorrect, how far to go with a Daubert determination. The Newburgh treatise that is cited in briefing, as in some of the case law, does talk about different approaches different circuits have taken. Some that, and we're put in that category by the current right of Newburgh, being a fairly intense examination before allowing class certification. So, is what the district judge, is what's important, what the district judge did here, is it inconsistent with Prantile? Does it violate Prantile? Well, I don't know that it's inconsistent or violative of Prantile, but if you study the case, Your Honor, it does say that there were objections to many of the expert reports in that case, including those of the plaintiffs. And there was an analysis of whether or not those expert opinions should be admitted, and many of them were permitted. And I do think use of Daubert at the class certification stage is appropriate, and certainly the Supreme Court has indicated that there needs to be a significant, intense kind of inquiry into the merits of the case, the class certification. We're not objecting to any of that. We think that favors us, to be honest, because of the strength of our expert report, the plaintiffs' affidavits, the testimony we've already talked about from the defendant's representative, and, in fact, the defendant's own expert, in part, agreeing with the position of our expert on the number of, the percentage of inaccuracy in the provider list. But what Prantile says is that, it says some of Archimedes' defense objections may only affect the weight of the expert reports without undermining their fundamental reliability. We don't think at this stage, where the court denied the Daubert motion, directed to plaintiff's expert, denied it, that has some significance. It means that that expert report is entitled to be given some degree of significant weight, that it's preliminarily found to be reliable, and relevant, and, of course, admissible as evidence. So, we are relying on the fact that the magistrate judge denied the defendant's Daubert motion. We are relying on our expert report to establish the fundamentals of what the underlying claim is. And we believe that the whole Daubert consideration, the whole analysis, is favorable for us. We have an expert that their challenge failed. He's delivered very detailed expert reports. He's very knowledgeable. He's clearly qualified. There's no dispute about that. And he has relied in turn on peer-reviewed papers that have been published and out in the market for everyone to read and see, that agrees with his conclusion that there is some degree of inflation paid by a policyholder when a material part of the represented provider network is in fact unavailable. And, again, all we have to show for standing is a trifle. A mere trifle is sufficient. That's the law. We're saying our claim, obviously, is worth more than a mere trifle. But, again, I want to emphasize that it's not a claim where we're asking for a return of the billions of dollars that Santin has been paid. It's just that we think we should be given an opportunity before a jury to present evidence, the expert evidence, the other evidence that we've identified, that shows that some piece of this premium is entitled to be paid in the way of damages to fulfill the benefit of the bargain under our contract claim. So does it make a difference either under statutes that you have to rely on or for any other reason, whether your complaint sets out the claim that it's the breadth, which I take to mean the percentage of available providers in a community that are available, or just the raw number of providers that are on the defendant's list? Is this a breadth issue or is it a numbers issue? It's not a numbers issue, Your Honor. It is a breadth issue. And we're not saying a specific number was falsely represented. We're simply saying there is an obligation under the law for the list of available providers to be accurate. And we have laid out what that law is, the Code of Federal Regulation. And if there is a material inaccuracy in that list, which is a contested fact, which a jury should be entitled to hear both sides about, we believe, if in fact that's true, that it is materially overstated, then some percentage of this premium, according to the theory of our case, we would be entitled to as benefit of the bargain damages. Is the evidence at this stage on the inaccuracy primarily the evidence on which, what percentage of the providers on the list actually made claims to the defendants during a certain time period? Yes. Yes, that is a measurement. Is that the sole evidence? I wouldn't say it's the sole evidence, Your Honor. We have the affidavits of the named plaintiffs in the case that describe their experiences and the fact that they thought they had access to essential providers that in fact they didn't. We have the 30B6 deposition I've cited. We have the hater expert reports, which Your Honor has referred to. And we have the defendant's expert that in part does not agree with us. And we think this, we haven't reached the summary judgment stage. We believe that we would be able to defeat a summary judgment motion based on those facts. But we haven't reached that stage in the case yet. All we're faced with now is a conclusion primarily based on a pleading issue, it seems, according to the magistrate judge, that we haven't shown injury in fact. But we have, and I believe for the reasons that I've outlined, there has been damage. It is fairly traceable, this damage, to the misstatements in the provider directories. That is all we really have to show in this case, that it's fairly traceable. We don't have to show causation. That's not a requirement. And U.S. Valencia, this court's decision makes that crystal clear. So it's not a case of a failure to show causation. It's whether or not we've alleged and have come forth, at least at this point, on the class search stage with sufficient evidence to merit allowing the case to go forward with regard to class certification proceedings in the district court. Because as noted, there have been no findings whatsoever about Rule 23. This is all about lack of injury. Thank you, Your Honors. I'll reserve my time. All right, counsel. Whoever goes next, you may proceed. Thank you, Judge Southwick, and good morning. Jacob Young on behalf of Superior Health Plan. Subject to the court's questions, I will be addressing the named plaintiff's standing, and my co-counsel, Mr. Cady, will address Superior's alternative arguments for affirming the opinion below. May it please the court. Plaintiff's injury theory is that each of Superior's customers paid an inflated market price solely because of the way Superior maintained its internal database of in-network providers. More specifically, plaintiffs say Superior should have deleted from that internal database any provider that did not bill a claim within some given 12-month period. Plaintiffs now need evidence that this practice caused a concrete and redressable injury in fact, and so their standing reduces to one question. Do plaintiffs have sufficient evidence that if Superior had deleted such providers from its internal database, the market price of its insurance would have been lower as a result? Well, I do think a key question here is whether we're really talking about evidence or are we talking about plausible claims. What's your position on why this is an evidence issue and how much of it is an evidence issue at the class certification stage? It is an evidentiary issue at the class certification stage, Judge Southwick, because as this court and as the Supreme Court have repeatedly held, standing has to be proven with the same manner and mode of evidence that is generally required at the instance stage of the case. And the class certification inquiry is an evidentiary standard under Rule 23 as this court has held several times including in the Unger case that Superior mentions in its brief. Would you agree that... I'm sorry, are you still answering Judge Southwick's question? No, go ahead, Judge Engelhardt. Okay, I was going to ask, would you agree that putting aside class certification, plaintiffs have standing to allege a breach of contract on their own behalf in the sense that they paid X thinking they were going to get providers A through M and in fact they got providers A through F just as a hypothetical characterization? As a hypothetical, I think it still matters that this is a putative class action. I think the answer may be no to that question because it is a Rule 23b3 damages class action and so what we need is not only an injury in fact but one that is redressable by monetary damages. And I think this court's decision in the Denning v. Bond Pharmacy case clearly establishes why that can be a dispositive issue. And so we would need some way of quantifying that type of breach into money. I'm asking about their claim alone. Before we get to whether they're suitable class representatives, whether they even have an articulable and definable class, if they standing alone had a claim that they paid a premium and didn't get what they thought the bargain was going to be, wouldn't they have standing at least for their own claims at that point? I think if we assume that it's not necessarily a class action, they may have standing on that type of claim because they would have a different universe of remedies potentially available to them and I think this court has concluded in the Denning case that just a breach of contract itself is a cognizable injury in fact. So taking out that putative class element of it, I think that does substantially change the nature of the question. And I think that's basically what the district judge has held so far that all as what was going to be proceeding was summary judgment, if I recall correctly, on the plaintiff's individual claims. So nothing that's been moved on so far would disagree with Judge Ingleheart's characterization that the individual claims stand. That's correct, Judge Southwick. I think plaintiffs have brought several different types of claims and the claims that issue in this appeal are particularly these overcharged claims on which plaintiffs have sought class certification. So there are other individual breach of contract claims that will not be affected by the disposition of this appeal. As to those claims, the key question is what Dr. Hayter's model can prove about the alleged overcharge, which more specifically is the difference between what Superior's customers actually paid and what they supposedly would have paid in the but-for world. And I think this court should evaluate Dr. Hayter's model in light of two fundamental principles, both of which it fails to live up to. The first is that market price is set by the market, which means at least the interaction of demand and supply. The second is that a theory of what the world would have looked like but for the challenged conduct has to plausibly account for the characteristics of this market. And Dr. Hayter's model fails under both of those characteristics because he analyzed only consumers' demand, or as he put it, their willingness to pay. And second, because he ignored all the salient characteristics of this market so severely that he posited a completely impossible but-for world. Or put differently, he relied on unsupportable assumptions, just like in the Earl versus Boeing case that Superior cites in its brief. And to briefly explain why that is, I think it's helpful to take a step back and just explain a little bit about how Dr. Hayter's model works. It has essentially three steps. First, Dr. Hayter started with a baseline metric that's supposed to capture Superior's provider network. As you probably know to Judge Southwick, that's the metric network breadth in his current model. And then second, Dr. Hayter purported to adjust that metric for supposed inaccuracy. But what he means by inaccuracy here is that he deleted any provider that happened not to bill a claim within some given 12-month period. And then third, Dr. Hayter tried to translate that. I'm not sure about that particular piece of evidence. The class covers quite a few years. I forget, 2014 to, I don't know, 2020 or whenever the complaint was filed perhaps. What is the evidence that Hayter's relying on? Is it a one-year period? It's throughout the entire class period, but if in any given sort of set of 12 months, a provider does not bill. So if in 2015 or whatever the month, whatever the actual 12-month period is, but let's say it's a calendar year, so removes any provider that did not make a claim in 2015, what happens if that provider made a claim in 2016 to the overall Hayter compilation? So Dr. Hayter is calculating damages on a monthly basis in each rating area. So what he's doing is assuming that for the 2015 12-month set, that that provider would not be in network. I believe it's consistent, therefore, that the same provider could be considered in network and out of network at different points in the class period, even though Dr. Hayter didn't actually check to see whether that provider had a contract with superior. And that's problem number two. What's number three? If I understood where you're headed. Sorry, I think that I had listed only two reasons there, but I think this is actually the most critical error, and Judge Southwick, your earlier questioning, I think, went right to the heart of this, which is whether this is an undisputed form of inaccuracy. And the answer is absolutely it's disputed. It's, in fact, completely incorrect. And so what makes you an in-network provider is that you have a contract with superior under which you have agreed to provide care to superior's customers. And we know that that's the definition of an in-network provider because three independent sources all agree on that point. Well, there's been discovery in this case. Did the plaintiff seek that information from the defendants as to who on this provider list actually had contracts? I don't know what evidence there would be on that. Is that in this record? It is not in this record because plaintiffs did not seek that information. The reason they didn't seek it is because they have a totally different theory of what makes you an in-network provider. And as Mr. Serra himself explained just a moment ago, it's based on academic literature. And I would point the court to page 1083 of the record, where Dr. Hayter explains what he's really looking at here. And he says that he's looking at a metric that is, quote, in line with what scholars perceive to be the true extent of a network. But scholars' perceptions have nothing to do with what the law actually requires. And I would point the court, I think, most specifically to page 1205 of the record because even Dr. Hayter, when asked neutrally to define what makes you an in-network provider, he said it's about a contractual relationship. So he's not even consistent on this point. It's not good enough to look to what academics consider to be a true provider network. You have to look to what the law actually requires here. Let me stop you there. All this depends in large part on how deeply we get into all of this at the class certification stage. The magistrate judge approved by the district judge said that the report was admissible, or the testimony, or whatever. But Hayter's opinion was admissible. All that Judge Higginbotham said in Prantill was admissibility is what he was looking at, that panel was looking at. And I'm just concerned about the law we would be making here for the ages. How would you define what is appropriate exploration, and what are you relying on in case law at this stage in looking at expert opinion? So in terms of what's required, I would point the court to exactly what the 8th, 9th, and 11th circuits have held, which is that standing at class certification is an evidentiary inquiry that follows the Rule 23 standard. When Newberg gets into that and lists, and those are probably the ones that are listed as being the more incisive, aggressive look, but other circuits don't go that far. What do you have from the 5th Circuit? Really, anything besides Prantill or Prantill? I don't think this court has addressed this question squarely yet, but I think that we see Prantill very differently from the plaintiffs, and I would point the court to exactly the same language that Mr. Serra provided, which is that when remanding, this court reminded the district court that issues with expert analysis can go to weight without undermining their fundamental reliability, and what plaintiffs are asking this court to do is stop at fundamental reliability. They're reading weight totally out of the equation. What the district court concluded here was that because of the serious and fundamental errors in Dr. Hader's model, it was entitled to no weight, and it was correct about that, and so this court should affirm. Well, counsel, we have several, two actually fairly significant recent cases on standing, how to do the analysis at classification stage, and the magistrate judge, district judge, didn't address that kind of analysis. What do you say to that? Is your honor referring to the Angel and Chavez decisions? Yeah. So the reason the magistrate judge did not address those is because it's actually a slightly different question. Those decisions are about class standing, which assumes that the named plaintiffs have an injury, in fact, on that claim, and then asks whether the injury is sufficiently similar to those of unnamed class members, and that's not the argument that Superior is making here. The argument Superior is making is about the named plaintiff's standing, which applies identically to everybody, so it's more like the Rivera case or the Fletcher v. Medic credit case where the court discusses how named plaintiffs' standing is a prerequisite to the Rule 23 analysis. All right, Mr. Yellen. Thank you. Mr. Cady, or pronounce your name for me. Good morning, your honors. Steve Cady for Apelli Superior Health Plan and Centene Management. If this court is not inclined to agree on standing, the court still should affirm on either of two alternative grounds. First, plaintiff's damages model does not match plaintiff's theory of liability. Plaintiff's theory of liability is that Superior's directory of providers contains inaccuracies, but plaintiff's damages model calculates damages based on an expectation of network breadth. This mismatch means that plaintiff's damages model does not pass muster under the Comcast fit test. And second, plaintiff's model offers no way to address the individual differences among class members because plaintiff's proposed no comment formula for evaluating the widely varying customer experiences with the provider directory search engine. They do not satisfy the Rule 23 predominance requirement. Both of these two grounds for affirmance are ripe because they've been fully briefed by both sides. They apply the same reasoning as in the opinion below. Discovery is closed, expert work is complete and closed, and the record is final and closed. Appellants have not argued that these two grounds should not be reached here, and I want to flush out both grounds. First, plaintiff's damages model does not fit the alleged wrong. The Comcast and Samson cases cited in our brief both teach that a class cannot be certified if plaintiff's damages model does not fit their theory of liability. In both of those cases, actually, reverse class certification on that basis. Plaintiff's theory of liability in this case is that Superior breached its contract by providing customers with an inaccurate provider directory, and you can see that most clearly at pages 581 through 583 of the record, which is the class certification motion. Now, what that means is that plaintiff's damages model must then calculate damages flowing exclusively from an inaccurate provider directory. But that is not what plaintiff's damages model does. Instead, plaintiff's damages model calculates damages based on network breadth, which is, Judge Southwick, as you said, is the portion of providers in a given region that are in network. Now, importantly, network breadth is different than directory accuracy, and those two concepts are not even necessarily directionally aligned. Katie, to make you understand better perhaps the distinction you're making, is the provider list given to an individual plaintiff, in this case, anybody who has this insurance limited to the community, or is this some broader list with a high percentage of them being providers that are well outside of the geographical area? Judge Southwick, it's an important point, because plaintiffs pretend that there's a master list of the directory that is provided to all customers, but that is not what the contract says, and it's not the way customers experience the provider directory. Page 817 of the record is the contract between Superior and its customers, and it says that customers, when they need a doctor, should use the provider directory search engine, which the contract says will customize the results for you based on what type of doctor you need, where you live, and even, of course, when you search, because the network changes all the time as doctors retire and graduate and join the network. And so there is no master list. There's this search engine, which is important to Rule 23 predominance because every customer is going to experience the search engine and see different search results, and you need to look into that for each customer. It also is important, Judge Southwick, because it means that no customer can really ascertain the overall network breadth of Superior because when customers access a directory, they're doing so through a search engine, which shows the type of provider they want in their area. Well, counsel, there is an obligation under the ACA or regulations, I think, for network breadth. Is there not? There are network adequacy requirements that are policed by various regulators in Texas. It's the Texas Department of Insurance that does make sure that there are enough providers. Let me stop you there. How could these plaintiffs, I've heard from your colleague that Discovery wasn't pursued in quite this way, perhaps, could this suit have pursued through Discovery a better collection of evidence of network breadth than is in the record now? Would the defendants have such information? Network breadth is very hard to ascertain. As a plaintiff's own expert told us at his deposition, I believe it's at page 1195 of his deposition, he told us that network breadth is hard to obtain, and he doesn't know Superior's network breadth, and he admits no customer does either. He said it would be very hard to determine Superior's network breadth because you would need information not just from Superior but from other insurance companies. You'd need to basically understand. You need to know who the medical providers are in whatever the relevant area is. That's right, Your Honor. That's right. And network breadth also is an inherently local concept. So a network breadth, let's say, in Houston, is going to look very different than a network breadth in Midland, Texas. And so it's extremely localized, which plaintiffs didn't analyze, and it'd be localized and change all the time for each region of Texas over time. None of this was analyzed. But what was analyzed is the concept of network breadth and whether any customer actually knew what Superior's network breadth was. And otherwise, could there even be a breach of contract? Well, the individual claims that some indication of network breadth was not provided. I mean, you have some sad tales of just pleadings, but nonetheless, about how it looked like network breadth failed for those individual plaintiffs. There were several individual plaintiffs that tell us their individual experiences with the health care. One says that she subscribed to the health insurance, and then later her doctor left the network, which is, of course, perfectly legal, and that happens. Others had out-of-pocket costs. And those claims will go forward and are not affected by this class search. The question that the district court was tackling is, should their case be able to be expanded into a class action? And the district court said no, for all the reasons that Mr. Young explained. No standing because plaintiff's expert report didn't make sense. It didn't analyze supply, demand, and the regulatory factors. In fact, it proposed an illegal network where you would delete a provider that doesn't bill a claim in year one. But as you mentioned, oftentimes the providers would bill a claim in year two. So luckily they weren't deleted. And you can see that our expert analyzed that at page 958 of the record and says, you know, this wouldn't make any sense to do. Analyzed what? Analyzed providers that plaintiffs said should have been deleted from the network because they didn't bill a claim, and then ended up billing a claim in the subsequent 12 months. And the reason that no health plan, I asked plaintiff's expert, do you know of any health plan that does what you're saying, deletes a provider from a network after they haven't billed a claim for 12 months? And a plaintiff's expert could not name a single health plan anywhere in the country that does such a thing. And the regulations would not permit health plans to do that. And in fact, plaintiff's expert does not advocate that even Superior does that. He said it's purely an exercise that he was told to do by the lawyers to create a damages model. The court rejected that exercise for good reason. And you can see at page 1370 of the record where the court concluded that plaintiff's theory of liability in this case is a breach of contract. And the breach was that Superior provided a materially inaccurate directory. And on the next few pages, the court said that plaintiffs had failed to show that any putative class member, even plaintiffs, had an expectation of network size. And the plaintiffs had failed to establish that anyone, including the plaintiffs, had an expectation of network size or network breadth. And the district court said, therefore. You said there are two alternative bases that we might want to consider. You want to spend a little time on the other before the bell rings? Yes, Your Honor, I'd appreciate that. The second alternative basis is that plaintiffs do not and cannot satisfy Rule 23's predominance test because they offer no common formula for addressing the individual differences that class members would have with the provider directory search engine. And I point the court to page 817 of the record, which is the key portion of the contract, which points customers to the search engine. And so we know that to figure out who was damaged in this case would require many trials, even to figure out a breach, because you'd have to figure out three things. One, who saw an inaccurate directory search result. Two, whether they were damaged by that. And three, whether they already have received a remedy, because Superior stands behind its provider directory search results. And you can see that at page 900 of the record, which is the contract, and 957 of the record, which is a declaration from Superior. What do you mean by stand behind? Well, Your Honor, it means that if a customer is damaged by an inaccurate directory search result, Superior will make that customer whole. And you can see that most clearly at the declaration at page 957 of the record, which explains the process. In addition, the regulator has a process to do the exact same thing, where customers can contact the Texas Department of Insurance, that has a program to help customers with problems like these. And so these individual mini-trials would be necessary to figure out who was damaged and make sure there's not double recovery. Well, we have your briefing on the rest of what you would love to say. Thank you, Your Honor. Thank you, Mr. Beatty. Mr. Ciro? Your Honors, we don't think, in light of the record, there having been no hearing on class certification, no evidentiary hearing, which are now typically called for in connection with class certification proceedings. These challenges to plaintiff's expert report, initially they have failed under the Daubert analysis. But the defense will have every opportunity at such an evidentiary hearing or at trial to challenge the bases of the expert's report, to try and undermine its credibility, to try and point out these errors that they've articulated here. But we don't think at this stage that is the role of this court. We think the absence of findings on class certification mean that the court should train its inquiry at this time on the standing question, which was relied on solely to deny class certification. And the question here is whether or not we have sufficiently tied the data and information that's laid out in great detail in Dr. Hayter's two reports to the theory of liability. And we believe we have sufficiently done that. And having had no testimony taken, no cross-examination, it's not appropriate at this point for the court to dismiss Dr. Hayter's reports out of hand and find no standing. What do you say in response to, I guess, Mr. Cady's remarks, which is in the briefing about that your claim is based on raw numbers, your evidence is based on raw numbers, but your claim is based on breadth. Just what, maybe it's not percentage, but what extent of locally available providers are actually covered by the insurance? Is there actually a difference there, or give me your reaction to the argument. Respectfully, I think my colleague, Mr. Cady, is not correct. This is not a case about specific numbers. It's a case about breadth, as articulated in the research papers, peer-reviewed research papers that are relied on by Dr. Hayter. It's not about a false representation about those X thousand providers here. It's about, are the published directories accurate when they were published? And our analysis of the expert, the other evidence we presented, shows that they clearly were materially inaccurate. And I think it's important to remember, by the way, Your Honors, with regard to the procedural posture here, is the defendants made a motion under Dalbert to exclude our expert. That motion was denied. The denial of that motion does have significant consequences. It means it's admissible evidence that's entitled to be considered. The defendants had every opportunity to object under Federal Rule 72A to that finding of the magistrate judge. They could have challenged it. But they didn't. They waived it. So what we have today, the court should not give great weight to these challenges to the expert in light of the procedural posture of this case. Their failure to challenge that ruling, their waiver on that order, and the fact that the judge, the magistrate judge, accepted under Dalbert plaintiff's expert evidence. Now, we don't think the court should be getting into the Rule 23 predominance issues, because there's been no findings. There's no record whatsoever. It would be a sua sponte analysis without, sometimes, as I said, there's evidentiary hearings on class certification. That may well have occurred here. We don't know how the district judge wanted to conduct that proceeding, because we never reached that point. It all turned on standard. It all turned on standard. Now, so let's say we agree with you that the district judge erred. What is the proper decree from this court? Your Honor, we would suggest that the court should find that the ruling of a lack of engineering fact was legal error and solely find that, for the reasons we've articulated in our briefs in here today, and remand the case back to the district court for further Rule 23 proceedings, because there has, despite there having been briefs, this all arose before the court had a chance to conduct a hearing. I was wondering how bold you were going to be, whether we should certify the class here would be your position. Your Honor. Which would not be an easy position to maintain, but nonetheless. We're not asking for that, because we don't think the record is sufficiently developed on that, because we've been confined to this. But we believe that we've met, and remember, Your Honor, we've met the low bar for standing. It is, under the law, a very low bar. The defense didn't object to the magistrate judge's denial of their motion, and they maintain their right to cross-examine the expert and go after him all they want. But this kind of determination, with regard to Rule 23, should be based on a fulsome record, which we don't yet have because of the procedural posture we talked about. But under these standards that are applicable, Your Honor, it is a low bar to show standing. Our extra report is deemed admissible and reliable. We have other evidence that supports it, and we believe the court should find standing exists here, and it in fact has occurred, and it's alleged. Thank you, Your Honors. All right, counsel. Thanks to all three of you and anybody else listening in out of camera view. I'm glad we were able to put this back together quickly, and hope it was satisfactory to you to have the argument presented in this way. It was. Thank you, Your Honor. Certainly. We'll take the case under advisement. We are adjourned. Thank you.